**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
WILLIAM GRIFFIS and T. ZENON
PHARMACEUTICALS, LLC, d/b/a                                :
PHARMACY MATTERS,
                                                          :    Civil Action No.
                                Plaintiffs,                    11-0263
                                                          :    Judge Joy Flowers Conti
                    vs.
                                                          :
HIGHMARK BLUE CROSS BLUE SHIELD
OF PENNSYLVANIA,                                           :

                                Defendant.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**AFFIDAVIT OF ANTHONY PADUANO IN SUPPORT OF
PLAINTIFF'S PETITION FOR ATTORNEYS' FEES AND COSTS AND INTEREST**

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK )

        ANTHONY PADUANO, under penalty of perjury, states:

        1.      I am admitted to practice law before this Court pro hac vice,

and am a member of the firm of Paduano & Weintraub LLP ("P&W").  I submit this

Affidavit in support of the petition for attorneys' fees and costs and interest of

Plaintiff William Griffis ("Griffis" or "Plaintiff") from defendant Highmark Blue Cross

Blue Shield of Pennsylvania ("Highmark" or "Defendant").   Pursuant to our prior

representations to the Court, today we filed a Notice of Dismissal pursuant to Fed.

R. Civ. P. Rule 41(a)(1)(A)(i) voluntarily dismissing T. Zenon Pharmaceuticals, LLC

(d/b/a/ Pharmacy Matters ("Pharmacy Matters").   We informed counsel for Highmark on December 6, 2011 that this would be done.

      2.    Plaintiff seeks $120,284.25 in attorneys' fees and $4,996.03 in expenses and disbursements for the work performed by P&W and $10,690.50 in attorneys' fees and $482.08 in expenses and disbursements for the work performed by Zimmer Kunz, PLLC ("Zimmer Kunz") for a total of $136,452.86 through December 9, 2011.  A summary of the fees and costs incurred is annexed hereto as Exhibit A.  Plaintiff also seeks interest as allowed by ERISA.

### Work Performed By P&W

      3.    When we were asked by Plaintiff to represent him in this matter, we provided him with a schedule of rates discounted from our typical ones. Our current rates, still discounted, are: partner: $595.00 per hour; counsel: $495.00 per hour; associate: $395.00 per hour; and paralegal $170.00 per hour.[1] We have served as lead counsel to Pharmacy Matters and individual patients served by Pharmacy Matters in matters of this type since 2009 throughout the country and have extensive experience and expertise in handling the unique issues presented in this matter.  I believe that our rates are reasonable commercial rates for attorneys, paralegals and support personnel rendering professional legal services in their immediate respective marketplaces and the national marketplace.

---

[1] P&W's standard billing rates currently in effect are: partner, up to $795.00; counsel, $525.00; associate, $450.00; and paralegal, $180.00.

4.      I have reviewed our firm's statements in connection with this action from December 1, 2010 through December 9, 2011[2] and I believe the work reflected in the statements to be accurate and reasonable.   P&W's statements contain a list of professionals and para-professionals providing services, their respective billing rates, the hours spent by each professional and para-professional, a general description of the services rendered, and a reasonably detailed breakdown of the disbursements incurred.

5.      Similarly, I have reviewed the disbursements for our statements from December 1, 2010 through December 9, 2011, which reflect out-of-pocket expenses and disbursements totaling $4,992.19.   A true and correct copy of P&W's statements are annexed hereto as Exhibit B.[3] I believe the disbursements to be accurate and all necessary and reasonably incurred in connection with this case.

6.      Plaintiff was required by Pennsylvania law to retain local counsel to represent them in this action.  Plaintiff retained Zimmer Kunz to serve as his local counsel.  Zimmer Kunz has billed a total of $10,690.50 in attorneys' fees and $482.08 in disbursements from February 2011 through and including December 9, 2011, for a total of $11,172.58.  A true and correct copy of Zimmer Kunz's statement is annexed to the Declaration of Meghan F. Wise, Esq. dated

---

[2] We will supplement the attorneys' fees, disbursements, and interest upon further briefing.

[3] Plaintiff only seeks recovery of attorneys' fees and costs for the specific services rendered that are outlined in Exhibit A.   Based upon our review of the invoices, P&W has redacted certain entries for which we do not seek recovery of fees and have revised the bills to reflect these changes.

December 12, 2011, submitted therewith as <u>Exhibit A</u>.

### Procedural History

7.      Pursuant to an insurance policy issued by Highmark for medical insurance, Pharmacy Matters provided Covered Services to Highmark's insureds (including Mr. Griffis) and submitted insurance claims to Highmark in excess of $425,000.00 in accordance with applicable procedures (Doc. No. 1, Compl. ¶ 10, 12).

8.      Although Mr. Griffis did not receive an inquiry from Highmark regarding his claims, much less a "denial," he attempted to resolve the dispute with Highmark without resort to litigation by commencing a series of formal and informal communications with Highmark (Doc. No. 1, Compl. ¶ 12).  At no point prior to June 17, 2011 did Highmark ever state or intimate that Griffis' employer, Penske Truck Leasing Co., LLP ("Penske"), had any role in approving or paying Griffis' claims, much less an important role.  If that had been disclosed to us, we would have instantly sought relief from Penske.

9.      By letter dated January 5, 2011, Plaintiff's attorneys asked, for the last time, for voluntary payment by Highmark (Doc. No. 1, Compl. ¶ 12 and Exh. B).

10.      Thereafter, on January 20, 2011, Highmark responded that it would not make payment on the invoices totaling $330,318.00 for medicine provided to Mr. Griffis (Doc. No. 1, Compl. ¶ 12 and Exh. C) and Plaintiff was forced to file the instant lawsuit.

11.     Plaintiff filed the Complaint on February 25, 2011 (Doc. No. 1). Highmark filed a Motion to Dismiss the Complaint on April 18, 2011 (Doc. No. 8-9). On April 29, 2011, Plaintiff served their Rule 26(a)(1) disclosures and produced documents to Highmark.

12.     Thereafter, Plaintiff submitted his opposition to the Motion to Dismiss on May 9, 2011 (Doc. No. 11-12), and nearly one month later, Highmark moved for leave to serve a reply on June 7, 2011 (Doc. No. 15), which the Court granted on June 15, 2011 (after Plaintiff served his objection to Highmark's reply) (Doc. No. 16 & 18).

13.     By letter dated May 20, 2011, Plaintiff offered to proceed to a "review" of the claims and stay the litigation if Highmark would in good faith deal with the facts presented by the Complaint. (Doc. No. 29, ¶ 5 and Exhibit B). Highmark rejected Plaintiff's offer on June 17, 2011.  But, for the first time, it revealed that Plaintiff's health coverage was through a self-insured employee benefit plan with Penske, and that Highmark administered the plan for Penske. (Doc. No. 29, ¶ 5 and Exhibit C).  On information and belief, it was Highmark alone under the Plan who determined what claims would be paid when.

14.     On May 25, 2011, the Court issued a Case Management Order, which required that Rule 26(a)(1) disclosures be filed on June 15, 2011 and initially set a Rule 16 conference for July 11, 2011 (the conference was subsequently rescheduled by the Court to July 20, 2011). (Doc. No. 13-14).

15.     Highmark failed, for the first time, to meet a Court-imposed

deadline for submission of its 26(a)(1) disclosures.   (Doc. No. 29, ¶ 6, 8). Ultimately, the parties agreed that Highmark would make its disclosures by July 15, 2011.  This is reflected in the joint 26(f) Report that was filed with the Court on June 29, 2011.

16.    On June 29, 2011, the parties filed a joint Report and ADR stipulation advising that the parties had chosen to proceed to court-sponsored arbitration and expected to conclude the arbitration by August 31, 2011 (Doc. No. 21).   In the Report, Highmark voluntarily agreed to serve its Rule 26(a)(1) disclosures by July 15, 2011 (Doc. No. 21).  On July 15, 2011, Plaintiff received an e-mail from Highmark's counsel stating "I wanted to let you know that we will be a few days late in getting Highmark's disclosures to you.  (I believe that they were due today.)  We will have them to you early next week, in advance of the Conference scheduled for July 20.  I apologize for any inconvenience".  (Doc. No. 29, ¶ 9 and Exhibit D).

17.    Highmark had no intention, however, of serving its disclosures. Instead, on July 18, 2011 -- two days prior to the July 20, 2011 Rule 16 conference with the Court and five months after commencement of this action -- Highmark filed its Motion to Stay these proceedings (Doc. No. 23).

18.    On July 22, 2011, Plaintiff filed his Response to Highmark's Motion to Stay. (Doc. No. 28 – 31).

19.   The Court held a hearing on Highmark's Motion to Stay on July 26, 2011.  The court deferred judgment on the Motion to Stay and continued the hearing to September 7, 2011.  The Court also ordered Highmark to inquire as to whether it would voluntarily start an administrative process regarding Plaintiff's claims and to notify the court regarding its findings no later than August 31, 2011.

20.   On August 19, 2011, Plaintiff filed a request for a discovery conference after Highmark – despite its pending Motion to Stay – served a subpoena on non-parties seeking depositions. (Doc. No. 32).  Highmark responded to Plaintiff's request on August 23, 2011 (Doc. No. 33) and Plaintiff filed a further response on August 29, 2011 (Doc. No. 34).

21.   On August 31, 2011, the Court denied Highmark's Motion to Dismiss Plaintiff's Complaint without prejudice and with leave for Highmark to renew the Motion to Dismiss if the parties were unable to reach an amicable resolution. The Court granted Highmark's Motion to Stay and stayed the proceedings for 30 days, in order to give the parties time to reach a resolution. Highmark informed the Court that it intended to withdraw the non-party subpoena.

22.   On October 3, 2011, a status conference was held before the Court in which Highmark indicated a willingness to pay the claims.

23.   Another status conference was held on October 17, 2011, at which time Highmark informed the Court that all Plaintiff's claims would be paid in full within 30 days.

24.   By order dated November 17, 2011, the Court directed the parties to confer in order to establish an agenda for the November 21, 2011 conference.   The parties conferred on November 18, 2011 and by letters dated November 18 and November 21 respectively. Plaintiffs and Defendant advised the Court of their positions concerning the outstanding issues to be addressed.

25.   A further status conference was held on November 21, 2011, at which time Plaintiffs stated definitively that they would voluntarily dismiss Pharmacy Matters from the case.   Since that time, Plaintiffs have attempted to obtain a stipulation from Highmark concerning the voluntary dismal but no agreement was reached.   Accordingly, today Plaintiffs have filed a Notice of Dismissal for Pharmacy Matters.

### Work Done By P&W To Force Payment

26.   Plaintiff's attorneys' fees fall into several categories:

a.   **December 21, 2010 to January 31, 2011**
**(Initial Pre-filing Investigation and Drafting of Demand**
**Letter)**

   i.   We communicated with Plaintiff to gather facts and to discuss strategies to get the claims paid;

   ii.   We drafted and sent a Demand Letter to Highmark;

b.   **February 1, 2011 to March 24, 2011**
**(Drafting and Filing of Initial Complaint)**

   i.   We continued to communicate with Plaintiff regarding fact-gathering and strategy;

   ii.   Lori Vinciguerra (P&W partner) researched injunctive relief under Pennsylvania law and ERISA and drafted the Complaint, which Jordan D. Becker (P&W partner) and I

reviewed and revised;

c. **March 25, 2011 to April 29, 2011**
   **(Rule 26 Disclosures and Document Production)**

   i. Ms. Vinciguerra participated in a 26(f) conference with Highmark and drafted the 26(f) report and the 26(a)(1) disclosures;

   ii. Daniel Altabef, a paralegal, prepared documents for production to Highmark;

   iii. Mr. Altabef finalized and served the 26(f) letter;

d. **May 2, 2011 to  July 26, 2011(Highmark Motion to Dismiss)**

   i. Alicia Etre (P&W associate) conducted legal research and drafted the opposition to the Highmark motion to dismiss the complaint filed on April 18, 2011;

   ii. Mr. Becker, Ms. Vinciguerra and I reviewed and revised the opposition to Highmark's motion to dismiss the complaint;

   iii. Mr. Altabef prepared the tables for the brief and, along with Trevor Matthews (P&W paralegal) prepared the opposition papers and exhibits for filing;

   iv. In June, Ms. Vinciguerra drafted an opposition to Highmark's motion to file a reply brief in support of its motion to dismiss;

   v. Ms. Vinciguerra and I reviewed, revised and finalized the 26(f) report;

   vi. Mr. Matthews prepared my pro hac application as well as preparing documents for the hearing that was initially scheduled for July 20, 2011 but that ultimately was held on July 26, 2011;

   vii. Ms. Etre reviewed Highmark's reply brief and highlighted key points in the cases cited by Highmark for the hearing that was initially scheduled for July 20, 2011 but that ultimately was held on July 26, 2011;

e.   **July 19, 2011 to July 26, 2011(Highmark Motion to Stay)**

   i.   Ms. Etre (P&W associate) conducted legal research and drafted the opposition to Highmark's motion to stay the proceedings;

   ii.   I continued to consult on strategy and reviewed and revised the opposition to Highmark's motion to stay;

   iii.   Ms. Vinciguerra drafted an affidavit in support of the opposition to Highmark's motion to stay;

   iv.   Mr. Matthews assisted in the preparation, filing and service of the opposition to Highmark's motion to stay;

   v.   With the assistance of Ms. Vinciguerra and Mr. Matthews I prepared for the hearing on Highmark's motion to stay that was ultimately held on July 26, 2011;

f.   **August 18, 2011 to  August 31, 2011 (Highmark Subpoena and Discovery Issues)**

   i.   Mr. Becker, Ms. Vinciguerra and I reviewed the subpoena issued by Highmark relating to third-party depositions and conferred regarding strategy;

   ii.   Mr. Becker drafted a letter to Highmark's counsel regarding the subpoena and drafted the discovery requests to be served on Highmark as well as the letter to the Court regarding discovery issues;

   iii.   Ms. Etre conducted discovery regarding the scope of discovery permitted in ERISA cases in the Third Circuit;

   iv.   Mr. Becker reviewed Ms. Etre's research and drafted a letter to the Court regarding discovery issues, which I reviewed and revised;

   v.   Mr. Becker, assisted by Mr. Matthews, gathered documents and prepared, filed and served the letter to the Court;

   vi.   I prepared for the August 31, 2011 conference before the Court, assisted by Mr. Becker, Ms. Vinciguerra and Mr. Matthews;

vii.    I conducted the conference before the Court on August 31, 2011;

g.    **September 1, 2011 to November 29, 2011**
**(Correspondence Leading to Payment of the Claims)**

i.    Ms. Vinciguerra, assisted by Mr. Matthews, corresponded with Highmark's counsel and the Court regarding payment of the claims, dismissal of Pharmacy Matters from the case, and various scheduling matters;

ii.    Ms. Vinciguerra and I continued to confer regarding strategy;

iii.    I prepared for and participated in the October 3, 2011 conference with the Court in which Highmark represented that Griffis' invoices would be paid, as well as the October 17, 2011 conference with the Court at which Highmark represented that the claims would be paid within 30 days;

iv.    I participated in conference calls regarding the status of the case and the opportunities for settlement;

v.    Ms. Vinciguerra participated in a meet and confer with Highmark's counsel regarding outstanding issues;

vi.    Ms. Vinciguerra drafted a stipulation of dismissal regarding Pharmacy Matters;

h.    **October 3, 2011 to December 12, 2011**
**(Preparation of Interest and Attorneys' Fee Petition)**

i.    Ms. Vinciguerra compiled interest calculations and attorneys' fees;

ii.    Ms. Vinciguerra, assisted by Mr. Matthews, corresponded with Highmark's counsel regarding payment of interest and attorneys' fees;

iii.    Jason Snyder (P&W associate) prepared the petition for attorneys' fees as well as drafts of my affidavit and Zimmer Kunz's affidavit;

iv.    Mr. Snyder conducted legal research on the standard for an attorneys' fee award in this district as well as the

standard for interest on ERISA claims, and drafted the memorandum of law in support of our petition for attorneys' fees;

v.   I reviewed and revised my affidavit as well as the memorandum of law in support of our petition for attorneys' fees;

vi.   Ms. Vinciguerra reviewed all of our firm's charges for legal services and disbursements in connection with this matter;

### Background Of P&W Lawyers And Other Professionals

### A.   My Background

27.   I have conducted trials and hearings in federal and state courts and before arbitration panels in 35 states.  I am a member of the bars of the following courts: Southern, Eastern, Northern, and Western Districts of New York, District of New Jersey, Eastern District of Michigan, Eastern District of Wisconsin, United States Court of Appeals for the Second Circuit, United States Court of Appeals for the Third Circuit, United States Court of Appeals for the Fifth Circuit, and the United States Supreme Court.  I am licensed to practice law in New York and New Jersey.

28.   I have been admitted to appear pro hac vice before, and have conducted trials or hearings in, the following federal courts:  Southern and Northern Districts of Alabama, Central, Northern and Southern Districts of California, District of Columbia, District of Connecticut, District of Delaware, Middle and Southern Districts of Florida, Northern District of Georgia, Northern District of Illinois, Southern and Northern Districts of Indiana, District of Iowa, District of Kansas,

Eastern District of Louisiana, District of Maryland, Eastern District of Missouri, District of New Hampshire, District of North Dakota, Southern and Northern Districts of Ohio, Eastern, Middle, and Western Districts of Pennsylvania, District of Puerto Rico, District of South Carolina, Eastern and Western Districts of Virginia, Northern District of West Virginia, and the state courts of California, Colorado, Connecticut, Delaware, Florida, Illinois, Indiana, Iowa, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Jersey, New York, North Carolina, Pennsylvania, Tennessee, Texas, Virginia, Washington and West Virginia.

29.     I graduated from Georgetown University with an A.B. cum laude in 1979; received an M.Sc.Econ. from the London School of Economics in 1981; and after attending Georgetown Law Center, graduated from Rutgers Law School in 1984, serving as a Member and Editor of the Rutgers Law Review and on the Moot Court Board.  During my last two years of law school, I was a law clerk for the NAACP Legal Defense and Educational Fund, Inc.  Upon graduating from law school, I became an associate at Cahill Gordon & Reindel, and worked there from March 1984 to December 1984, and then again from January, 1986 until June, 1991. From January 1, 1985 until December 31, 1985, I served as law clerk to the late Clarkson S. Fisher, then Chief Judge of the United States District Court for the District of New Jersey.

30.     While at Cahill Gordon & Reindel, I was, pro bono, principal lawyer for two capital punishment cases that attracted enormous attention as they worked through the New York, Mississippi and federal court systems.  The cases,

Johnson v. Mississippi, 486 US 578 (1988), and Minnick v. Mississippi, 498 US 146 (1990), were won in the Supreme Court of the United States.   I have published two law review articles proposing changes in the capital punishment system; those articles have been analyzed twice by the United States Supreme Court in Ramdass v. Angelone, 530 U.S. 156 (2000) and O'Dell v. Netherland, 521 U.S. 151 (1997), and by the Fifth and Eleventh Circuit Courts of Appeal, the Supreme Courts of New Jersey, Mississippi and Wyoming and in some 80 law review articles, including those of Harvard, Yale and Columbia Law Schools.  I have been appointed by the United States Court of Appeals for the Second Circuit to represent an indigent criminal defendant who had a meritorious constitutional appeal.

31.    I have been lead counsel in arbitrations before FINRA (and its predecessor entities), the American Arbitration Association, and the National Futures Association, and have appeared specially before the federal courts of Brazil.  I have handled many matters involving compliance and regulatory issues before the United States Securities and Exchange Commission (the "SEC"), other self-regulatory organizations and various state regulators.   Our firm's principal clients are J.P.Morgan, Citigroup, Prudential Financial, Deutsche Bank and Wells Fargo.

32.    The many published decisions in which I have been involved are available on Westlaw and Lexis.  Articles about my work have appeared in: Forbes, The New York Times, The Wall Street Journal, The National Law Journal, The

American Lawyer, Newsday, The Manhattan Lawyer and other publications.  I have given lectures before FINRA arbitrators regarding the way arbitration panels are to conduct themselves.   I have lectured to conferences convened by the Texas Bar Association, Rutgers Law School and New York University School of Law regarding the ethical obligations of lawyers.

33.    In 1998, I received the "Thurgood Marshall Award" from the Association of the Bar of the City of New York "in recognition of exemplary service to the cause of justice in the United States."

34.    One pro bono capital case team that I led at Cahill Gordon & Reindel was awarded the "David S. Michael Award" for Courageous Efforts in Promoting Integrity in the Criminal Justice System by the New York State Bar Association in 1990.

35.    In 2006, 2007 and 2010, I was named a "Super Lawyer©" (New York) by "Law & Politics Magazine."

36.    I have an AV Rating© from Martindale-Hubbell©, the highest rating available.

37.    In March, 2006, on the nomination of the U.S. Securities and Exchange Commission in the matter of Cobalt Multi-Family Investors, (S.D.N.Y.), I was appointed Receiver for a series of fraudulent financial services firms located in New York, Texas, Massachusetts and Florida.   The appointment was made by Chief Judge Michael B. Mukasey.

B.      **Background Of Other P&W Attorneys And Paralegals**

38.     Jordan D. Becker has been a practicing lawyer for 25 years. Mr. Becker is a member of the bars of the United States Court of Appeals for the Second Circuit, the Southern and Eastern Districts of New York, the Southern District of Illinois, the District of Colorado and he has also been admitted pro hac vice in several state and federal courts.   Mr. Becker graduated from Princeton University in 1982 with an A.B. in History; he graduated from Fordham University School of Law in 1986, and served as a Member and Associate Editor of the Fordham Law Review.  Mr. Becker's Note, Removing Temptation: Per Se Reversal for Judicial Indication of Belief in the Defendant's Guilt was published at 53 Fordham L. Rev. (1985).  After graduating from law school, Mr. Becker became an associate at Cahill Gordon & Reindel LLP where he worked from 1986 to 1991. Mr. Becker worked at other New York law firms until he joined the predecessor of P&W as an associate in 1994.   Mr. Becker worked at Prudential Securities as a Vice President and Corporate Counsel from 2000 to 2004, and then he joined P&W as a partner.  Mr. Becker's practice has focused on commercial litigation.   Mr. Becker has argued before the United States Court of Appeals for the Second Circuit and conducted hearings and/or trials in federal and state courts including: the Southern and Eastern Districts of New York, the District of Colorado, the Northern and Central Districts of Illinois, the District of New Jersey, the Eastern District of Pennsylvania, the Southern District of Georgia, the Northern District of Iowa and the state courts of New York, New Jersey, Delaware, Connecticut, Pennsylvania,

Texas, Florida and Massachusetts.   Mr. Becker has also been lead counsel in arbitrations before FINRA and its predecessor entities.

39.   Lori Vinciguerra has been practicing for 25 years and is admitted in New York as well as the Southern and Eastern Districts of New York. Ms. Vinciguerra graduated with a B.A. from the State University of New York at Stony Brook, cum laude, in 1982 and Hofstra University School of Law, with Distinction, in 1985; served as a Member and Notes and Comments Editor of the Hofstra Law Review.   Upon graduating from law school, Ms. Vinciguerra was a law assistant for the New York Supreme Court Appellate Division – Second Department from 1986 to 1988, and then an associate at Rosenman & Colin LLP from 1988 to 1996 where she practiced general commercial litigation in federal and state courts and before administrative agencies and arbitration panels with an emphasis on securities and commodities litigation and regulation.   From 1996 to June 2009, Ms. Vinciguerra served as a Senior Attorney and Senior Vice President at Wells Fargo Advisors, LLC (formerly known as Wachovia Securities and before that Prudential Securities), where she handled all aspects of arbitrations, administrative proceedings and litigations involving both customer and employee disputes, and acted as the firm's commodities counsel.   Ms. Vinciguerra joined P&W in July 2009 as senior counsel and became a partner in January 2011.   Ms. Vinciguerra handles complex financial services, employment, securities and commodities litigation as well as insurance-related litigation in cases throughout the country.

40. Jason Snyder, an associate, graduated from Queens College with a B.A. summa cum laude in 1995 and from Harvard Law School in 1998. Mr. Snyder worked at Cahill Gordon & Reindel LLP as an associate from 1998 to 2000. He then joined Brobeck, Phleger & Harrison LLP as an associate in its business and technology group where he worked from 2000 to 2001 before returning to Cahill Gordon & Reindel LLP where he worked in its London and New York offices from 2003 to 2006. Mr. Snyder then joined Mayer, Brown, Rowe & Maw LLP as an associate from 2006 to 2007. He then became the general counsel and vice president of business development for Taxi Technology Corporation in Englewood, New Jersey in 2007, and then served as a consultant in the general counsel's office for Merrill Lynch & Co. Inc. in 2008 before joining P&W in late 2008.

41. Alicia Etre graduated from Cornell University with a B.S. in 2000 and from New York Law School in 2006. Ms. Etre joined P&W while in law school as a law clerk and then joined P&W full-time in September, 2006 as an associate. Since joining P&W, these associates have worked on business, securities, financial services, employment and insurance litigations in federal and state courts and in arbitrations before FINRA and its predecessor entities.

42. Our staff paralegals have worked on this matter, including:

a. Daniel Altabef (Columbia University, B.A., 2008; at P&W July, 2008 to June, 2011; Mr. Altabef is currently attending Fordham University School of Law); and

b. Trevor Mathews (Harvard University, A.B., 2010; at P&W, from December, 2010 to date).

43.   I believe that all of the attorneys' fees sought were reasonably expended on the particular task reflected in the annexed statements (see Exhibit A). The inclusion of Pharmacy Matters as a Plaintiff in these proceedings did not require additional or different work from that performed on behalf of Plaintiff Griffis.   Accordingly, the attorneys' fees sought are the full amount of the fees incurred notwithstanding the request that Pharmacy Matters be dismissed as a Plaintiff in this action, without prejudice.

### Interest

44.   An award of pre-judgment interest is appropriate here. Highmark refused to pay claims for life-saving drugs based on legal and factual concoctions that it has since discarded and did so after we sued.  With respect to Plaintiff's claims, no reason for non-payment was ever advanced.  This is exactly the type of situation where the maximum amount of pre-judgment interest should be applied.

45.   In the Third Circuit, the rate of pre-judgment interest in ERISA cases is left to the discretion of the trial court.

46.   Under Pennsylvania's "prompt pay" law, when Highmark has not paid a claim within 45 days, interest accrues on such claims at a rate of ten per centum (10%).  Interest is calculated beginning the day after the required payment date and ending on the date the claim is paid. See 40 P.S. § 991.2166.  The Court should exercise its discretion to award Plaintiff interest at the Pennsylvania "prompt pay" rate.  A schedule calculating the interest owed, based on the

"prompt pay" rate in the total amount of $99,409.09 as of December 12, 2011 is annexed hereto as Exhibit C.

47.    Alternatively, this Court recently awarded interest in an ERISA case at the default pre-judgment interest rate under Pennsylvania law, 6%.[4]    A schedule calculating the interest owed, based on the default pre-judgment interest rate under Pennsylvania law in the total amount of $55,697.71 as of December 12, 2011 is annexed hereto as Exhibit C.

48.    Other courts in this District have awarded pre-judgment interest in ERISA cases by applying the federal post-judgment interest rate found in 28 U.S.C. §1961.  Section 1961 (a) provides in relevant part:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

---

[4] See Haisley v. Sedgwick Claims Management Services, Inc., 2011 WL 4565494, 12 (W.D. Pa. Sept. 29, 2011)(Conti, J.) (finding that a 6%pre-judgment interest rate on ERISA claims is reasonable); 41 Pa. Cons.Stat. § 202.

### The Attorneys' Fees and Costs Owed

49.   Plaintiff respectfully requests that the Court allow him to recover $130,974.75 in attorneys' fees and costs in the amount of $5,478.11, for a total of $136,452.86.   Plaintiff also requests that he be awarded interest as allowed by law in the amount of $99,409.09.

Anthony Paduano

SWORN TO BEFORE ME THIS
12TH DAY OF DECEMBER, 2011.

Notary Public
My commission expires

JORDAN D. BECKER
Notary Public, State of New York
No. 60-5001832
Qualified in Westchester County
Commission Expires .......... 9/19/14

# EXHIBIT A

# Pharmacy Matters v. Highmark Blue Cross Blue Shield
## Summary Billing Sheet

| Month Ending: | P&W Fees | P&W Disbs |
|---|---|---|
| Dec. 2010 - Feb. 2011 | 19,516.00 | 0.00 |
| March 2011 | 1,041.25 | 7.80 |
| April 2011 | 3,807.50 | 51.33 |
| May 2011 | 25,298.50 | 975.87 |
| June/July 2011 | 33,276.25 | 2,322.51 |
| August 2011 | 15,987.50 | 1,218.54 |
| Sept. - Nov. 2011 | 12,346.25 | 416.14 |
| Dec. 1 - 9, 2011 | 9,011.00 | 3.84 |

| Total Billed | 120,284.25 | 4,996.03 |
|---|---|---|

| Total Fees: | 120,284.25 |
|---|---|
| Total Disbursements: | 4,996.03 |
| TOTAL: | 125,280.28 |

# EXHIBIT B

# (FILED UNDER SEAL)